RECEIVED
USDC, CLERK GREENVILLE.
2026 JUN ~ AM II: 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

---

**Toronto King**

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**-against-**

**Maximus Education, LLC d/b/a Aidvantage**

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

---

**Complaint for a Civil Case**

Case No. 4:26-cv-2147-JFA-PJG

*(to be filled in by the Clerk's Office)*

Jury Trial:    ☒ Yes    ☐ No
*(check one)*

JUN 1 2026 AM 11:15
USDC GREENVILLE SC

I.    **The Parties to This Complaint**

A.    **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Toronto King |
| Street Address | 7612 Carvers Bay Rd |
| City and County | Hemingway |
| State and Zip Code | SC 29554 |
| Telephone Number | 8433257399 |

B.    **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | AIDVANTAGE/Maximus Education LLC |
| Job or Title (if known) | |
| Street Address | Corporation Service Company, 100 Coastal Drive, Suite 210 |
| City and County | Charleston |
| State and Zip Code | South Carolina 29492 |
| Telephone Number | 8433257399 |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

Defendant No. 3

| | |
|---|---|
| Name | |

2

Job or Title
(if known)                   _____

Street Address               _____

City and County              _____

State and Zip Code           _____

Telephone Number             _____

Defendant No. 4

Name                         _____

Job or Title
(if known)                   _____

Street Address               _____

City and County              _____

State and Zip Code           _____

Telephone Number             _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒  Federal question             ☐  Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

15 U.S.C. § 1681s-2(b)
_____

_____

_____

3

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

a.    If the plaintiff is an individual

The plaintiff, *(name)* _____ Toronto King _____, is a citizen of
the State of *(name)* __ South Carolina __ .

b.    If the plaintiff is a corporation

The plaintiff, *(name)* ____ AIDVANTAGE/Maximus Education LLC ____, is incorporated
under the laws of the State of *(name)* ___ South Carolina ___,
and has its principal place of business in the State of *(name)*
____ South Carolina ____ .

*(If more than one plaintiff is named in the complaint, attach an additional
page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____, is a citizen of
the State of *(name)* _____. *Or* is a citizen of
*(foreign nation)* _____.

b.    If the defendant is a corporation

The defendant, *(name)* ____ AIDVANTAGE/Maximus Education LLC ____, is
incorporated under the laws of the State of *(name)*
____ South Carolina ____, and has its principal place of
business in the State of *(name)* _____ Virginia _____. *Or* is
incorporated under the laws of *(foreign nation)*
_____, and has its principal place of
business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an
additional page providing the same information for each additional
defendant.)*

4

3.    The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

_____

_____

_____

## III.    Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

_____

_____

_____

_____

_____

## IV.    Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

_____

_____

_____

_____

## V.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____June_____, 2026

Signature of Plaintiff _____Toonto King_____

Printed Name of Plaintiff _____Toronto King_____

### B.    For Attorneys

Date of signing: _____, 20___.

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Address _____

Telephone Number _____

E-mail Address _____

6

## UNITED STATES DISTRICT COURT FOR THIS DISTRICT OF SOUTH CAROLINA

TORONTO KING,

        Plaintiff,

        v.

AIDVANTAGE/Maximus Education LLC

        Defendant(s).

**Civil Action No.**

**Jury Trail Demanded**

## I. INTRODUCTION

1. This is a civil action for damages brought by Plaintiff Toronto King, a consumer, against Defendant Maximus Education, LLC, doing business as Aidvantage ("Defendant" or "Aidvantage"), pursuant to the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* ("FCRA"), for Defendant's willful and negligent violations of its duties as a furnisher of information to consumer reporting agencies under 15 U.S.C. §1681s-2(b).

2. The FCRA imposes affirmative duties on furnishers of information who receive notice from a consumer reporting agency that a consumer has disputed the completeness or accuracy of information. Upon receiving such notice, the furnisher must conduct a reasonable investigation, review all relevant information forwarded by the consumer reporting agency, report accurate results, notify all nationwide consumer reporting agencies if the information is found to be inaccurate, and modify, delete, or permanently block information that is inaccurate, incomplete,

or cannot be verified. 15 U.S.C. §1681s-2(b)(1)(A)–(E). Defendant failed to comply with each of these mandatory duties.

## II. JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case arises under federal law, specifically the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. This Court also has jurisdiction pursuant to 15 U.S.C. §1681p, which provides that an action to enforce any liability created under the FCRA may be brought in any appropriate United States district court.

4. Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiff resides in Hemingway, South Carolina. Defendant furnishes information concerning Plaintiff to consumer reporting agencies that compile and maintain files on Plaintiff in this District, and the inaccurate consumer report was disseminated to third parties who made adverse credit decisions affecting Plaintiff in this District.

## III. PARTIES

5. Plaintiff Toronto King ("Plaintiff") is a natural person and a "consumer" as defined by the Fair Credit Reporting Act, 15 U.S.C. §1681a(c). Plaintiff resides in Hemingway, Williamsburg County, South Carolina, within the Florence Division of this District.

6. Defendant Maximus Education, LLC, doing business as Aidvantage ("Defendant" or "Aidvantage"), is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Reston, Virginia. Aidvantage is the federal student loan servicing division of Maximus, Inc., a publicly traded corporation. Defendant's registered agent

for service of process in South Carolina is Corporation Service Company, 100 Coastal Drive, Suite 210, Charleston, South Carolina 29492.

7. At all times relevant herein, Defendant was a "person" as defined by 15 U.S.C. §1681a(b) that regularly furnished information to one or more nationwide consumer reporting agencies, including Equifax Information Services LLC ("Equifax"), TransUnion LLC ("TransUnion"), and Experian Information Solutions, Inc. ("Experian"), about its transactions and experiences with consumers. Defendant is therefore a "furnisher of information" subject to the duties and obligations imposed by 15 U.S.C. §1681s-2(b).

8. At all relevant times, Defendant acted through its agents, employees, contractors, and representatives, who were acting within the scope of such agency and employment.

## IV. BACKGROUND — THE FAIR CREDIT REPORTING ACT

9. Congress enacted the Fair Credit Reporting Act upon finding that "the banking system is dependent upon fair and accurate credit reporting" and that "inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. §1681(a)(1).

10. Congress further found that "consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "there is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. §1681(a)(3)–(4).

11. To effectuate these findings, the FCRA imposes specific duties on both consumer reporting agencies and furnishers of information. When a consumer disputes information with a consumer reporting agency and the agency transmits notice of that dispute to the furnisher via an Automated Consumer Dispute Verification ("ACDV"), the furnisher becomes obligated under 15 U.S.C. §1681s-2(b)(1) to conduct a reasonable investigation, review all relevant information, report accurate results, and correct or delete inaccurate information. These duties exist because Congress recognized that furnishers, as the source of the data, are uniquely positioned to verify its accuracy.

12. The statutory text of 15 U.S.C. §1681s-2(b)(1) provides, in relevant part:

"After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute regarding the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) If the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information, and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate, incomplete, or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a

consumer reporting agency only, as appropriate, based on the results of the reinvestigation, promptly:

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information."

## V. FACTS OF THE COMPLAINT

13. Plaintiff Toronto King is a consumer who relies on the accuracy of information contained in his consumer credit reports to obtain credit, secure favorable interest rates, maintain existing credit relationships, and pursue financial opportunities essential to his livelihood. Inaccurate information on Plaintiff's credit reports directly and materially impacts his ability to participate in the consumer credit marketplace.

14. On or about July 15, 2025, Plaintiff obtained a copy of his consumer report from Equifax through annualcreditreport.com (Equifax Confirmation No. 5196536958). Upon review, Plaintiff discovered that Defendant Aidvantage was furnishing materially inaccurate and misleading information on five student loan tradelines. Each tradeline is identified below with the specific inaccuracies:

(a) **DEPT OF ED/AIDVANTAGE, Account No. \*0210 (Opened 08/26/2021):** Defendant reports a balance of $2,130 against a high credit of $2,000, with a status of "Over 120 Days Past Due" and a date of first delinquency of 11/15/2024. The payment history shows a 90-day late payment reported in January 2025, escalating to 120 days in February 2025, 150 days in March 2025, and 180 days in April 2025. However, no 30-day or 60-day late payments were reported before the 90-day late payment in January 2025, which is impossible under standard Metro 2

credit reporting guidelines, as delinquency must progress sequentially (30→60→90→120). The payment history further shows missing data ("No Data Available," Narrative Code 088) for April 2023, May 2023, January 2024, and May 2024. The last payment date is reported as 08/16/2023, and the scheduled payment amount is $20. Defendant's own servicer portal indicates that Plaintiff's payment is not due until April 5, 2026, contradicting the reported delinquency status.

**(b) DEPT OF ED/AIDVANTAGE, Account No. *0200 (Opened 08/20/2020):** Defendant reports a balance of $3,668 against a high credit of $3,500, with a status of "Over 120 Days Past Due" and a date of first delinquency of 11/15/2024. The payment history shows a 90-day late payment reported in January 2025, escalating to 120 days in February 2025, 150 days in March 2025, and 180 days in April 2025 — again with no preceding 30-day or 60-day late. Missing data for April 2023, May 2023, January 2024, and May 2024. The last payment date is 08/16/2023, and the scheduled payment amount is $34. Defendant's servicer portal confirms payment is not due until April 5, 2026.

**(c) DEPT OF ED/AIDVANTAGE, Account No. *0210 (Opened 08/26/2021):** Defendant reports a balance of $4,793 against a high credit of $4,500, with a status of "Over 120 Days Past Due" and a date of first delinquency of 11/15/2024. The payment history shows the same anomalous pattern: a 90-day late in January 2025, escalating to 180 days by April 2025, with no preceding 30-day or 60-day delinquency and missing data for April 2023, May 2023, January 2024, and May 2024. The last payment was on 08/16/2023, and the scheduled payment amount is $46. This account number (*0210) appears to be a duplicate of the tradeline identified in subparagraph (a) above, as both carry the same account number suffix. Defendant's servicer portal confirms payment is not due until April 5, 2026.

**(d) DEPT OF ED/AIDVANTAGE, Account No. *0200 (Opened 08/20/2020):** Defendant reports a balance of $2,096 against a high credit of $2,000, with a status of "Over 120 Days Past Due" and a date of first delinquency of 11/15/2024. The same anomalous payment history pattern: 90 days 90-day late in January 2025, escalating to 180 days by April 2025, with no prior 30-day or 60-day delinquency and missing data for April 2023, May 2023, January 2024, and May 2024. The last payment was on 08/16/2023, and the scheduled payment is $19. This account number (*0200) appears to be a duplicate of the tradeline identified in subparagraph (b) above. Defendant's servicer portal confirms payment is not due until April 5, 2026.

**(e) DEPT OF ED/AIDVANTAGE, Account No. *0200 (Opened 02/13/2020):** Defendant reports a balance of $2,948 against a high credit of $2,732, with a status of "Over 120 Days Past Due" and a date of first delinquency of 11/15/2024. The same anomalous payment history pattern: 90 days 90-day late in January 2025, escalating to 180 days by April 2025, with no prior 30-day or 60-day delinquency and missing data for April 2023, May 2023, January 2024, and May 2024. The last payment was on 08/16/2023, and the scheduled payment is $29. Defendant's servicer portal confirms payment is not due until April 5, 2026.

15. All five tradelines report a 90-day late payment in January 2025, yet none of the tradelines show a preceding 30-day late or 60-day late payment in November or December 2024. Under Metro 2 credit reporting standards, delinquency progresses sequentially: an account cannot be reported as 90 days past due without first having been reported as 30 days and then 60 days past due. The sudden appearance of a 90-day late payment with no delinquency progression demonstrates that Defendant's reporting is facially inaccurate.

16. Defendant's own servicer portal at Aidvantage confirms that Plaintiff's next payment is not due until April 5, 2026. This directly contradicts Defendant's reporting of these accounts as "Over 120 Days Past Due" and as having escalated delinquency since January 2025. If no payment was due, no payment could be late. Defendant is simultaneously telling Plaintiff that nothing is owed while telling consumer reporting agencies that Plaintiff is severely delinquent.

17. **Missing Payment History Data:** All five tradelines show "No Data Available" (Narrative Code 088, indicating "Student Loan — Payment Deferred") for April 2023, May 2023, January 2024, and May 2024. These gaps render the payment history incomplete and unverifiable.

18. **Duplicate Tradeline Reporting:** Upon information and belief, two of the account numbers ending in *0210 and two or more of the account numbers ending in *0200 appear to be duplicate tradelines for the same underlying loan accounts, artificially multiplying the appearance of delinquent accounts on Plaintiff's consumer report.

19. **Escalating Balances on Deferred Accounts:** The balances on all five tradelines have been increasing month over month (e.g., Account *0210 increased from $2,000 in July 2023 to $2,130 in April 2025; Account *0200 increased from $3,500 to $3,668 over the same period) despite the last payment date being 08/16/2023 on all accounts and Defendant's own portal reflecting that no payment is currently due. This balance escalation during a period when no payment was required raises serious questions about improper interest accrual on accounts that should be in deferment or forbearance.

### *The Dispute*

20. On or about July 17, 2025, Plaintiff sent a detailed written dispute to Equifax via United States Postal Service certified mail, return receipt requested, USPS tracking number 9214 8902

3589 0900 0033 3375 41. The dispute specifically identified each of the five Aidvantage tradelines, described the inaccuracies in detail — including the false 90-day late payment with no preceding 30 or 60-day delinquency, the missing payment history data, the balance discrepancies, the duplicate tradelines, and the fact that Defendant's own servicer portal showed no payment was due until April 5, 2026 — and demanded correction or deletion.

21. Plaintiff enclosed a copy of his Equifax consumer report, his South Carolina driver's license, his Social Security card, and other identifying information with the dispute. Plaintiff's dispute letter and accompanying documentation are attached hereto and incorporated herein as Exhibit A.

22. Upon information and belief, Equifax received Plaintiff's dispute on or about July 25, 2025.

23. In his dispute, Plaintiff specifically demanded that Equifax verify the payment history on each tradeline, investigate the 90-day late payment that Defendant Maximus Education reported without a preceding 30-day or 60-day late, verify the balance discrepancies, investigate the duplicate account numbers, and account for the fact that Defendant's own servicer portal showed no payment was due until April 5, 2026. Plaintiff demanded that the inaccurate information be corrected or, in the alternative, that the tradelines be deleted entirely.

24. Upon receiving Plaintiff's dispute, Equifax was required, pursuant to 15 U.S.C. §1681i(a)(2), to provide notification of the dispute to the furnisher of the disputed information and to forward all relevant information submitted by the consumer. Upon information and belief, Equifax generated and transmitted an Automated Consumer Dispute Verification ("ACDV") to Defendant

Aidvantage, notifying Defendant of Plaintiff's dispute and forwarding all relevant information provided by Plaintiff.

25. Upon receipt of the ACDV from Equifax, Defendant was required under 15 U.S.C. §1681s-2(b)(1) to: (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by Equifax pursuant to 15 U.S.C. §1681i(a)(2); (C) report the results of the investigation to Equifax; (D) if the investigation found that the information was incomplete or inaccurate, report those results to all other nationwide consumer reporting agencies to which Defendant furnished the information, including TransUnion and Experian; and (E) if the disputed information was found to be inaccurate, incomplete, or could not be verified, promptly modify, delete, or permanently block the reporting of that information.

26. Upon information and belief, the disputed tradelines were updated on or about July 31, 2025, as reflected in Plaintiff's subsequent credit report (Exhibit B), which is consistent with Defendant having received the ACDV from Equifax and having taken some action on the file. Despite this, the defendant did not correct the inaccurate information.

27. Upon information and belief, Defendant failed to conduct a reasonable investigation with respect to the disputed information. Instead, Defendant performed nothing more than a cursory, automated review of its internal electronic system data or account summaries and verified the information as accurate to Equifax without reviewing original account-level documentation.

28. Specifically, Defendant did not obtain or review the underlying source documents necessary to determine the accuracy of the disputed information, including but not limited to: the original master promissory notes, disbursement records, detailed payment ledgers showing dates and

amounts of each payment received, monthly billing statements, records of any deferment, forbearance, or income-driven repayment plan enrollment, and records documenting when payments were due and when they were received.

29. Had Defendant conducted a reasonable investigation, it would have discovered that: (a) its own servicer portal showed Plaintiff's next payment was not due until April 5, 2026, directly contradicting the reported delinquency; (b) the reported 90-day late payment in January 2025 was preceded by no 30-day or 60-day late payment, which is facially impossible under standard delinquency progression; (c) the payment history was incomplete, with missing data for multiple months; and (d) certain tradelines appeared to be duplicative.

30. Instead, Defendant verified the accounts as accurate based solely on electronic system data or summaries, without confirming actual source records or reconciling the glaring contradiction between its delinquency reporting and its own servicer portal records. This cursory, automated review does not constitute the "investigation" required by 15 U.S.C. §1681s-2(b)(1)(A).

31. Upon information and belief, Defendant reported the disputed information as "verified" to Equifax, despite having conducted no meaningful investigation. This response was materially misleading to Equifax because it conveyed that Defendant had confirmed the accuracy of the disputed information through a legitimate investigation, when in fact no such investigation occurred.

### Why Defendant's Failure Is Legally Inadequate

32. The United States Court of Appeals for the Eleventh Circuit has held that a furnisher's "investigation must be more than a cursory review of internal data." *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1303–04 (11th Cir. 2016). A furnisher cannot satisfy its

statutory duty by simply checking whether its internal computer records match the information it previously reported to the consumer reporting agency. The statute requires the furnisher to go beyond internal summaries and examine original account-level documentation to determine whether the disputed information is, in fact, accurate.

33. The United States Court of Appeals for the Fourth Circuit — the circuit in which this Court sits — has held that a "reasonable investigation" under §1681s-2(b) requires "a good faith effort by the furnisher to determine the actual accuracy of the disputed information," which may include "reviewing underlying documents where appropriate." *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004). The defendant made no such good faith effort. Had Defendant simply consulted its own servicer portal, it would have confirmed that Plaintiff's account showed no payment due until April 5, 2026, rendering the reported delinquencies false.

34. Furthermore, in *Saunders v. Branch Banking & Trust Co. of VA*, 526 F.3d 142 (4th Cir. 2008), the Fourth Circuit recognized that a furnisher's decision to report disputed information as "verified" after conducting an unreasonable investigation can itself constitute a willful violation of the FCRA. Defendant's response to Equifax — verifying the accuracy of delinquency information that is directly contradicted by Defendant's own servicer portal — falls squarely within this precedent.

35. By relying exclusively on internal electronic data and failing to review any original underlying documentation or even reconcile the contradiction between its reporting and its own servicer platform, Defendant's so-called "investigation" was insufficient as a matter of law and violated 15 U.S.C. §1681s-2(b)(1)(A) through (E).

### *Ongoing Harm and Concrete Injury*

36. As a direct and proximate result of Defendant's inadequate investigation and continued furnishing of inaccurate information, the inaccurate tradelines have remained on Plaintiff's consumer reports maintained by Equifax and, upon information and belief, TransUnion and Experian.

37. On September 5, 2025, Plaintiff obtained a copy of his Equifax consumer report through annualcreditreport.com. The report showed no corrections to the inaccurate information and no notation indicating that it had not been a reasonable investigation of the false late payments, incorrect balances, and missing data field. The September 5, 2025, report is attached hereto and incorporated herein as Exhibit B.

38. As a direct and proximate result of the inaccurate information Defendant continued to furnish, Plaintiff suffered the following concrete, particularized harms:

(a) On June 17, 2025, Synchrony Bank closed Plaintiff's ROOMS TO GO/SYNCHRONY BANK credit account ending in 0680 as a direct result of the negative credit information furnished by Defendant. The adverse action letter from Synchrony Bank (Exhibit C) expressly identifies "Too Many Delinquent or Derogatory Accounts" as one of the reasons for the closure. The five Aidvantage tradelines — all falsely reporting delinquencies ranging from 90 to 180 days past due — are precisely the type of derogatory accounts that triggered Synchrony Bank's adverse decision. The letter further states that Synchrony Bank relied on a TransUnion credit score of 581, scored on May 29, 2025, which had been suppressed by Defendant's inaccurate

reporting. The closure of this account further damaged Plaintiff's credit profile by reducing his available credit, increasing his credit utilization ratio, and shortening his average account age.

(b) The reporting of five tradelines — including apparent duplicates — all showing "Over 120 Days Past Due" with escalating delinquency from 90 to 180 days has catastrophically suppressed Plaintiff's FICO credit scores. The combined effect of five severely delinquent accounts constitutes the most damaging type of information that can appear on a consumer report, making Plaintiff appear to be a severe credit risk when his actual payment history does not warrant such a characterization.

(c) Plaintiff has suffered substantial emotional distress as a direct result of Defendant's conduct, including persistent anxiety about his financial standing, difficulty sleeping, recurring headaches, stress-related physical symptoms, humiliation and embarrassment when denied credit and when his existing credit account was closed, and the mental anguish of knowing that his own loan servicer's portal confirms no payment is due while simultaneously reporting him as severely delinquent to the credit bureaus. Plaintiff has been frustrated by his inability to correct false information despite his diligent efforts.

(d) Plaintiff has expended significant time and effort attempting to correct the inaccurate information, including researching his rights, drafting and mailing his certified dispute, monitoring his credit reports, and pursuing this litigation, time that would otherwise have been devoted to productive personal and financial activities.

39. The inaccurate tradelines furnished by Defendant remain on Plaintiff's consumer reports despite Plaintiff's dispute, causing ongoing and continuing damage to Plaintiff's credit reputation, financial standing, and emotional well-being.

40. Plaintiff's injuries satisfy the standing requirements of Article III of the United States Constitution. Per *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021), "[o]nly plaintiffs concretely harmed by a defendant's statutory violation have Article III standing to seek damages." Plaintiff has suffered concrete, particularized harm through (1) the publication of materially inaccurate information to third parties, including Synchrony Bank, which relied upon it in making adverse credit decisions; (2) the closure of an existing credit account; (3) denial of credit; and (4) emotional distress. Plaintiff's injury is directly traceable to Defendant's failure to conduct a reasonable investigation under §1681s-2(b) and is redressable by an award of damages and equitable relief from this Court.

41. Defendant's conduct was willful and carried out in reckless disregard of Plaintiff's rights under the FCRA. Under *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69 (2007), "[a] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran an unjustifiably high risk of violating the statute." Defendant's decision to verify delinquency information that directly *contradicts* its own servicer portal records, where Defendant's system shows no payment was due until April 5, 2026, satisfies this standard. No reasonable furnisher would verify an account as "Over 120 Days Past Due" when its own records show no payment was due.

42. Defendant Aidvantage, as a federally contracted student loan servicer managing accounts for approximately 5.6 million borrowers, is a sophisticated entity with actual knowledge of its obligations under the FCRA. Defendant has access to legal counsel, compliance departments, and the resources necessary to conduct meaningful investigations of consumer disputes.

Defendant's decision to verify disputed information without reviewing original loan documentation or reconciling contradictions in its own records was not a one-time oversight but reflects a systemic policy or practice of responding to consumer disputes through cursory automated processes rather than the reasonable investigations required by law.

43. Upon information and belief, Defendant has been the subject of numerous consumer complaints, regulatory scrutiny, and litigation arising from its servicing practices, including allegations of inaccurate record-keeping, sloppy administration of borrower accounts, failure to process deferment and forbearance status properly, and systemic mismanagement of the federal student loan portfolio it manages. This history further demonstrates that Defendant was on notice that its investigation procedures were inadequate and chose to continue its practices in reckless disregard of consumer rights.

44. Alternatively, Defendant's conduct was, at a minimum, negligent.

## VI. EXHIBITS

45. **Exhibit A** — Plaintiff's direct dispute letter to Equifax, dated July 17, 2025, sent via USPS certified mail (tracking number 9214 8902 3589 0900 0033 3375 41), including Plaintiff's Equifax consumer report, South Carolina driver's license, Social Security card, and identifying information.

46. **Exhibit B** — Plaintiff's updated Equifax consumer report obtained on September 5, 2025, from annualcreditreport.com, reflecting no corrections to the disputed tradelines.

47. **Exhibit C** — Adverse action notice from Synchrony Bank, dated June 17, 2025, regarding closure of Plaintiff's ROOMS TO GO/SYNCHRONY BANK account ending in 0680, citing

"Too Many Delinquent Or Derogatory Accounts" among the reasons for the adverse action, based on Plaintiff's TransUnion credit score of 581 (scored May 29, 2025).

## VII. FIRST CLAIM FOR RELIEF

Violation of the Fair Credit Reporting Act

### 15 U.S.C. §1681s-2(b)(1)(A)

48. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

49. Under 15 U.S.C. §1681s-2(b)(1)(A), after receiving notice of a dispute from a consumer reporting agency pursuant to 15 U.S.C. §1681i(a)(2), a furnisher of information shall conduct an investigation with respect to the disputed information.

50. Defendant violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct a reasonable investigation with respect to the disputed information after receiving notice of Plaintiff's dispute via the ACDV from Equifax. Defendant merely conducted a cursory, automated review of its internal system data without reviewing original account-level documentation, without reconciling the reported delinquency against its own servicer portal records showing no payment was due until April 5, 2026, and without investigating why Maximus Education reported a 90-day late payment with no preceding 30-day or 60-day delinquency. As held in *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1303–04 (11th Cir. 2016), and *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004), such a cursory review of internal data does not constitute a reasonable investigation under the FCRA.

51. Defendant caused injury to Plaintiff by causing, among other effects, the continued publication of inaccurate information to third parties, resulting in denial of credit, closure of an existing credit account, damage to Plaintiff's credit reputation, and mental and emotional distress.

52. Defendant's conduct was willful, exhibiting reckless disregard for Plaintiff's rights under the FCRA, entitling Plaintiff to statutory damages of not less than $100 and not more than $1,000, actual damages, and punitive damages pursuant to 15 U.S.C. §1681n.

53. Alternatively, Defendant's conduct was negligent, entitling Plaintiff to actual damages and litigation costs pursuant to 15 U.S.C. §1681o.

## VIII. SECOND CLAIM FOR RELIEF

Violation of the Fair Credit Reporting Act

### 15 U.S.C. §1681s-2(b)(1)(B)

54. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

55. Under 15 U.S.C. §1681s-2(b)(1)(B), after receiving notice of a dispute from a consumer reporting agency, a furnisher shall review all relevant information provided by the consumer reporting agency pursuant to 15 U.S.C. §1681i(a)(2).

56. Defendant violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by Equifax with the ACDV, including Plaintiff's detailed certified dispute letter identifying the specific inaccuracies — the impossible 90-day late without preceding delinquency, the servicer portal showing no payment due until April 5, 2026, the missing payment history data, the balance discrepancies, and the duplicate tradelines. Had Defendant reviewed this information and compared it against its own records, it would have identified the discrepancies and corrected the reporting.

57. Defendant caused injury to Plaintiff by causing, among other effects, the continued publication of inaccurate information to third parties, resulting in denial of credit, closure of an existing credit account, damage to Plaintiff's credit reputation, and mental and emotional distress.

58. Defendant's conduct was willful, exhibiting reckless disregard for Plaintiff's rights under the FCRA, entitling Plaintiff to statutory damages of not less than $100 and not more than $1,000, actual damages, and punitive damages pursuant to 15 U.S.C. §1681n.

59. Alternatively, Defendant's conduct was negligent, entitling Plaintiff to actual damages and litigation costs pursuant to 15 U.S.C. §1681o.

## IX. THIRD CLAIM FOR RELIEF

Violation of the Fair Credit Reporting Act

### 15 U.S.C. §1681s-2(b)(1)(C)

60. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

61. Under 15 U.S.C. §1681s-2(b)(1)(C), after receiving notice of a dispute from a consumer reporting agency, a furnisher shall report the results of the investigation to the consumer reporting agency.

62. Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting the disputed information as "verified" or accurate to Equifax based on an inadequate investigation that consisted solely of reviewing internal system data. This response was materially misleading because it led Equifax to believe that Defendant had confirmed the accuracy of the delinquency reporting, which is directly contradicted by Defendant's own servicer portal, which shows no payment was due until April 5, 2026. See *Saunders v. Branch Banking & Trust Co. of VA*, 526 F.3d 142 (4th Cir. 2008).

63. Defendant caused injury to Plaintiff by causing, among other effects, the continued publication of inaccurate information to third parties, resulting in denial of credit, closure of an existing credit account, damage to Plaintiff's credit reputation, and mental and emotional distress.

64. Defendant's conduct was willful, exhibiting reckless disregard for Plaintiff's rights under the FCRA, entitling Plaintiff to statutory damages of not less than $100 and not more than $1,000, actual damages, and punitive damages pursuant to 15 U.S.C. §1681n.

65. Alternatively, Defendant's conduct was negligent, entitling Plaintiff to actual damages and litigation costs pursuant to 15 U.S.C. §1681o.

## X. FOURTH CLAIM FOR RELIEF

Violation of the Fair Credit Reporting Act

**15 U.S.C. §1681s-2(b)(1)(D)**

66. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

67. Under 15 U.S.C. §1681s-2(b)(1)(D), if the investigation finds that the information is incomplete or inaccurate, a furnisher shall report those results to all other consumer reporting agencies to which the person furnished the information, and that compile and maintain files on consumers on a nationwide basis.

68. Defendant violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to report the inaccurate or corrected information to all nationwide consumer reporting agencies to which Defendant furnished the disputed tradeline information, including but not limited to Equifax, TransUnion, and Experian. Upon information and belief, the inaccurate information furnished by Defendant continues to appear on Plaintiff's consumer reports maintained by multiple consumer reporting agencies.

69. Defendant caused injury in fact to Plaintiff by causing, among other effects, the continued publication of inaccurate information to third parties across multiple consumer reporting

agencies, resulting in denial of credit, closure of an existing credit account, damage to Plaintiff's credit reputation, and mental and emotional distress.

70. Defendant's conduct was willful, exhibiting reckless disregard for Plaintiff's rights under the FCRA, entitling Plaintiff to statutory damages of not less than $100 and not more than $1,000, actual damages, and punitive damages pursuant to 15 U.S.C. §1681n.

71. Alternatively, Defendant's conduct was negligent, entitling Plaintiff to actual damages and litigation costs pursuant to 15 U.S.C. §1681o.

## XI. FIFTH CLAIM FOR RELIEF

Violation of the Fair Credit Reporting Act

### 15 U.S.C. §1681s-2(b)(1)(E)

72. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

73. Under 15 U.S.C. §1681s-2(b)(1)(E), if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation, a furnisher shall, for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly: (i) modify that item of information; (ii) delete that item of information; or (iii) permanently block the reporting of that item of information.

74. Defendant violated 15 U.S.C. §1681s-2(b)(1)(E) by failing to modify, delete, or permanently block the inaccurate or unverifiable information contained in the disputed tradelines. Despite the reported delinquency being directly contradicted by Defendant's own servicer portal showing no payment was due until April 5, 2026, despite the facially impossible delinquency progression showing a 90-day late without preceding 30-day or 60-day lates, and despite being unable to verify the accuracy of the disputed information through original account-level documentation,

Defendant continued to report the disputed information to consumer reporting agencies without modification, deletion, or blocking.

75. Defendant caused injury to Plaintiff by causing, among other effects, the continued publication of inaccurate information to third parties, resulting in denial of credit, closure of an existing credit account, damage to Plaintiff's credit reputation, and mental and emotional distress.

76. Defendant's conduct was willful, exhibiting reckless disregard for Plaintiff's rights under the FCRA, entitling Plaintiff to statutory damages of not less than $100 and not more than $1,000, actual damages, and punitive damages pursuant to 15 U.S.C. §1681n.

77. Alternatively, Defendant's conduct was negligent, entitling Plaintiff to actual damages and litigation costs pursuant to 15 U.S.C. §1681o.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Toronto King respectfully demands judgment against Defendant Maximus Education, LLC, d/b/a Aidvantage, as follows:

78. Awarding Plaintiff actual damages in an amount to be determined at trial, including but not limited to damages for emotional distress, mental anguish, humiliation, and loss of credit opportunities;

79. Awarding Plaintiff statutory damages pursuant to 15 U.S.C. §1681n for each willful violation of the FCRA;

80. Awarding Plaintiff punitive damages in an amount sufficient to deter Defendant from future violations of the FCRA;

81. Awarding Plaintiff the costs of this action, including court costs;

82. Granting all pertinent, including an order requiring Defendant to permanently correct or delete the inaccurate tradelines from Plaintiff's credit file with all consumer reporting agencies to which Defendant furnishes information, including Equifax, TransUnion, and Experian;

83. Awarding Plaintiff such other and further relief as this Court may deem just and appropriate.

## XIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: June 1, 2026

Respectfully submitted,

Toronto King

7612 Carvers Bay Rd, Hemingway, SC 29554

TorontoKing1@proton.me

8433257399